IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KRYSTAL SHANNON,           :
                           :
        Plaintiff          :     CIVIL NO. 4:11-CV-00289
                           :
    vs.                    :
                           :
MICHAEL J. ASTRUE,         :
COMMISSIONER OF SOCIAL     :     (Judge Rambo)
SECURITY,                  :
                           :
        Defendant          :

## MEMORANDUM AND ORDER

## Background

Plaintiff, Krystal Shannon, is seeking review of a decision by the Commissioner of Social Security ("Commissioner") denying her claim for social security disability insurance benefits.  For the reasons set forth below, the court will remand the case to the Commissioner for further proceedings.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is

undisputed that Shannon met the insured status
requirements of the Social Security Act through December
31, 2006. Tr. 7, 107, 123, 125 and 174;[1] Doc. 7,
Plaintiff's Brief, p. 7.  In order to establish
entitlement to disability insurance benefits, Shannon
was required to establish that she suffered from a
disability on or before that date.  42 U.S.C. §
423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008);
see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

    Shannon was born in the United States on
September 13, 1974. Tr. 105 and 108.  Shannon graduated
from high school and can read, write, speak and
understand the English language and perform basic and
complex mathematical functions. Tr. 38, 128 and 140.
After graduating from high school, she attended college
for four-plus years. Tr. 140.  Shannon also obtained a
chiropractic degree from Life University in Marietta,
Georgia.  Tr. 112, 172 and 233.

---

1.  References to "Tr.___" are to pages of the
administrative record filed by the Defendant as part of
his Answer on April 29, 2011.

Shannon has past relevant employment as a ninth grade science teacher (physics and chemistry) which was described by a vocational expert as skilled, medium work; as an x-ray technician instructor described as skilled, medium work; as a spa attendant described as unskilled, medium work; as a bookkeeper/office worker described as semi-skilled, light work; and as a certified nursing assistant described as semi-skilled, heavy work. Tr. 40 and 72.

Records of the Social Security Administration reveal that Shannon had earnings in the years 1988 through 1993, 1995 through 1998, and 2000 through 2002 as follows: 1988 ($197.63), 1989 ($1048.36), 1990 ($2362.46), 1991 ($5645.17), 1992 ($10457.54), 1993 ($4256.63), 1995 ($1561.68), 1996 ($607.00), 1997 ($4486.44), 1998 ($9402.48), 2000 ($22185.44), 2001 ($32152.50) and 2002 ($21928.84). Tr. 124.  Shannon's total earnings were $116,292.17. Id.

Shannon stopped working in 2002 because of a dispute over pay and a decision to pursue other employment. Tr. 45.  However, other employment did not

become available and she stayed home with her children and pursued some college courses. Id.

Shannon claims that she became disabled on November 11, 2004, primarily because of Reflex Sympathetic Dystrophy Syndrome(RSDS). Tr. 129; Doc. 7, Plaintiff's Brief, p. 2.

RSDS is also known as Complex Regional Pain Syndrome. Complex Regional Pain Syndrome Information Page, National Institute of Neurological Disorders and Stroke, National Institute of Health, http://www.ninds. nih.gov/disorders/reflex_sympathetic_dystrophy/reflex_sy mpathetic_dystrophy.htm (Last accessed March 26, 2012). "Complex regional pain syndrome (CRPS) is a chronic pain condition.  The key symptom of CRPS is continuous, intense pain out of proportion to the severity of the injury, which gets worse rather than better over time. CRPS most often affects one of the arms, legs, hands, or feet. Often the pain spreads to include the entire arm or leg. Typical features include dramatic changes in the color and temperature of the skin over the affected limb or body part, accompanied by intense burning pain, skin sensitivity, sweating, and swelling." Id.  The Mayo

Clinic website indicates that there are two types of CRPS - Type 1 and Type 2.  Type 1 is described as follows: "Previously known as reflex sympathetic dystrophy syndrome, this type occurs after an illness or injury that didn't directly damage the nerves in your affected limb . . . .  Many cases of complex regional pain syndrome occur after a forceful trauma to an arm or leg, such as a crush injury, fracture or amputation. Other major and minor traumas – such as surgery, heart attacks, infections, fractures and even sprained ankles – also can lead to complex regional pain syndrome. Emotional stress may be a precipitating factor, as well." MayoClinic.com, Complex Regional Pain Syndrome, http://www.mayoclinic.com/health/complex-regional-pain-syndrome/DS00265/DSECTION=causes (last visited March 26, 2012).  As will be explained in more detail, *infra,* the administrative law judge found that Shannon's RSDS was not a medically determinable impairment.

Shannon contends that the impetus for her RSDS was a dental procedure, i.e., a root canal, which occurred on November 11, 2004, and a subsequent infection. Tr. 295.  The root canal was only partially

completed on November 11, 2004. Tr. 407, 555 and 566.
At a subsequent appointment in February, 2005, the root
canal was completed by a different dentist.  Tr. 295 and
306.  After the dental procedure, Shannon developed left
facial redness and swelling, numbness of the tongue, lip
and cheek on the left side, eyelid twitching, and
widespread severe burning pain, in her arms, hands, legs
and feet. Tr. 129 and 306.

Shannon  has not engaged in any substantial
gainful work activity since November 11, 2004, the
alleged disability onset date. Id.

On June 6, 2006, Shannon protectively filed an
application for social security disability insurance
benefits. Tr. 33 and 107-108.[2]  On September 27, 2006,
the Bureau of Disability Determination in Maryland[3]

_____

2.  Protective filing is a term for the first time an
individual contacts the Social Security Administration
to file a claim for benefits.  A protective filing date
allows an individual to have an earlier application
date than the date the application is actually signed.

3.  Shannon was residing in the state of Maryland. The
Bureau of Disability Determination is an agency of the
state which initially evaluates applications for
disability insurance benefits on behalf of the Social
Security Administration. Tr. 77.

denied Shannon's application. Tr 77-80.  On November 9,
2006, Shannon filed a request for reconsideration. Tr.
83.  On March 30, 2007, the Social Security
Administration denied the request for reconsideration.
Tr. 84-85.  Consequently, on April 28, 2007, Shannon
requested a hearing before an administrative law judge.
Tr. 86.   After approximately 19 months had passed, a
hearing was held before an administrative law judge on
November 25, 2008. Tr. 31-74.  On February 19, 2009, the
administrative law judge issued a decision denying
Shannon's application for benefits. Tr. 7-30.  On March
13, 2009, Shannon filed a request for review of the
administrative law judge's decision with the Appeals
Council of the Social Security Administration. Tr. 4.
The Appeals Council, on December 15, 2010, concluded
that there was no basis upon which to grant Shannon's
request for review. Tr. 1-3.  Thus, the administrative
law judge's decision stood as the final decision of the
Commissioner.

      On February 10, 2011, Shannon filed a complaint
in this court requesting that the court reverse the
decision of the Commissioner and award her benefits, or

remand the case to the Commissioner for further
proceedings.  Supporting and opposing briefs were
submitted and the appeal[4] became ripe for disposition on
July 29, 2011, when Shannon filed her reply brief.

**STANDARD OF REVIEW**

When considering a social security appeal, this
court has plenary review of all legal issues decided by
the Commissioner.  See <u>Poulos v. Comm'r of Soc. Sec.</u>,
474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Comm'r of
Soc. Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir. 1999);
<u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir.
1995).  However, our review of the Commissioner's
findings of fact pursuant to 42 U.S.C. § 405(g) is to
determine whether those findings are supported by
"substantial evidence."  <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d
1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d
1058, 1064 (3d Cir. 1993).  Factual findings which are
supported by substantial evidence must be upheld. 42

---

4. Under the Local Rules of Court "[a] civil action
brought to review a decision of the Social Security
Administration denying a claim for social security
disability benefits" is "adjudicated as an appeal."
M.D.Pa. Local Rule 83.40.1.

U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38
(3d Cir. 2001)("Where the ALJ's findings of fact are
supported by substantial evidence, we are bound by those
findings, even if we would have decided the factual
inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700,
704 (3d Cir. 1981)("Findings of fact by the Secretary
must be accepted as conclusive by a reviewing court if
supported by substantial evidence."); <u>Keefe v. Shalala</u>,
71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270
F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894
F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

  Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such
relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.'" <u>Pierce v. Underwood</u>,
487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co.
v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v.
Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008);
<u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999).
Substantial evidence has been described as more than a
mere scintilla of evidence but less than a
preponderance.  <u>Brown</u>, 845 F.2d at 1213.  In an

9

adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d

Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407
(3d Cir. 1979).


**Sequential Evaluation Process**

To receive disability benefits, the plaintiff
must demonstrate an "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be
expected to result in death or which has lasted or can
be expected to last for a continuous period of not less
than 12 months."   42 U.S.C. § 432(d)(1)(A).
Furthermore,

> [A]n individual shall be determined to be
> under a disability only if his physical or
> mental impairment or impairments are of such
> severity that he is not only unable to do his
> previous work but cannot, considering his age,
> education, and work experience, engage in any
> other kind of substantial gainful work which
> exists in the national economy, regardless of
> whether such work exists in the immediate area
> in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of
> the preceding sentence (with respect to any
> individual), "work which exists in the
> national economy" means work which exists in

significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[5] (2) has an impairment that is severe or a combination of impairments that is severe,[6] (3) has an impairment or combination of

_____

5.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

6.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent
(continued...)

12

impairments that meets or equals the requirements of a
listed impairment,[7] (4) has the residual functional
capacity to return to his or her past work and (5) if
not, whether he or she can perform other work in the
national economy. Id.  As part of step four, the
administrative law judge must determine the claimant's
residual functional capacity. Id.[8]

---

6.  (...continued)
steps of the sequential evaluation process.  20 C.F.R.
§§ 404.1523 and 404.1545(a)(2).

7.  If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment,
the claimant is disabled. If the claimant does not have
an impairment or combination of impairments that meets
or equals a listed impairment, the sequential
evaluation process proceeds to the next step. 20 C.F.R.
§ 404.1525 explains that the listing of impairments
"describes for each of the major body systems
impairments that [are] consider[ed] to be severe enough
to prevent an individual from doing any gainful
activity, regardless of his or her age, education, or
work experience."  Section 404.1525 also explains that
if an impairment does not meet or medically equal the
criteria of a listing, an applicant for benefits may
still be found disabled at a later step in the
sequential evaluation process.

8.  If the claimant has the residual functional capacity
to do his or her past relevant work, the claimant is
not disabled.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  <u>Id.</u>; 20 C.F.R. § 404.1545; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## **MEDICAL RECORDS**

Before the court addresses the administrative law judge's decision, the court will first review some of Shannon's medical records.

14

On December 13, 2004, Shannon had an appointment with Joy Lewis, M.D., in Salisbury, Maryland. Tr. 12 and 373.  At that appointment, Shannon complained of headache, a rash on the face, chest and arms, and pressure in her ears. Tr. 373.  She stated that since the dental procedure in mid-November, she noticed that her smile was uneven and the left side of her face felt numb and she had a tingling sensation in the middle part of her lips. Id.  Dr. Lewis observed that Shannon appeared distressed and had "a blotchy rash on her chest" and her "forehead [was] quite pink." Id.

On December 26, 2004, Shannon visited the emergency department at the Peninsula Regional Medical Center, located in Salisbury, Maryland, complaining of sharp chest pain. Tr. 256-258.  On January 2, 2005, Shannon again visited the emergency department at the Peninsula Regional Medical Center. Tr. 275.  On this second occasion Shannon complained of pain and swelling on the left side of her face, headache on the left side,

some flushing[9] and pain in her neck, chest pain, intermittent left hand tingling, intermittent pain in her left thigh and occasional fevers. Id.

On January 4, 2005, Shannon had an appointment with Anthony J. Frey, M.D., a cardiologist, in Salisbury. Tr. 407-409.  At this appointment Shannon complained of "pins and needles like feeling on the left side of her left hand and leg, some low-grade temperatures, intermittent fascial [sic] swelling and flushing, and generalized fatigue and aches." Tr. 407. Shannon also complained of chest discomfort. Id.

On January 21, 2005, Shannon telephoned Dr. Lewis's office and reported that she had recurrent "red hands, feet and sore tongue since December." Tr. 372 and 594.

On January 24, 2005, Shannon had an appointment with an optometrist. Tr. 588 and 559.  At that

9.  Flush is defined as "transient, episodic redness of the face and neck caused by certain diseases, ingestion of certain drugs or other substances, heat, emotional factors, or physical exertion." Dorland's Illustrated Medical Dictionary, 644 (27th Ed. 1988).

appointment, Shannon complained of eye and facial pain.
Id.

On April 13, 2005, Shannon had an appointment
with Richard E. Bird, M.D., a neurologist. Tr. 295-297.
Dr. Bird observed frequent blushing throughout the chest
and face. Tr. 296.

On May 12, 2005, Shannon had an appointment with
Edmund MacLaughlin, M.D., a rheumatologist, located in
Cambridge, Maryland.  Dr. MacLaughlin noted in his
report of that appointment as follows: "I cannot
definitely correlate all of her problems to her left-
sided dental procedure."  However, he further stated
that Shannon had a "left upper quadrant [referring to an
area of discomfort] that is ill defined and I cannot
definitely characterize it." Tr. 285.

At an appointment with Dr. Bird on June 2, 2005,
Shannon complained of "intermittent redness and swelling
of her hands, arthralgias,[10] aching in the left upper

10.  Arthralgia is defined as "pain in a joint."
Dorland's Illustrated Medical Dictionary, 147 (27th Ed.
                                        (continued...)

quadrant, pain in the left jaw, peculiar feeling around the left side of her mouth . . . and pain in her ears." Tr. 294.

On July 7, 2005, Shannon had an appointment with Daniel J. Kelley, M.D., an ear, nose and throat specialist, located in Salisbury, Maryland. Tr. 305-306. At that appointment, Shannon complained of constant, daily facial pain and twitching, and numbness of her lips. Id.

On July 12, 2005, Shannon had an appointment with Howard Moses, M.D., a neurologist, in Lutherville, Maryland. Tr. 306-307. At that appointment, Shannon complained of "left eyeball pain, twitching of the upper and lower lids on the left, left perioral[11] numbness" and that "[a]t times [her] tongue feels burnt." Tr. 306. Shannon also complained of severe headaches. Id. Dr.

---

10. (...continued)
1988).

11. Perioral is defined as "situated or occurring around the mouth." Dorland's Illustrated Medical Dictionary, 1261 (27th Ed. 1988).

Moses stated that "[t]here may be a temporal but not an etiological relationship between the headaches, facial pain and the recent root canal." Tr. 307.

On September 1, 2005, Shannon had an appointment with Gregory B. Lanpher, M.D., an allergist, located in Baltimore, Maryland. Tr. 309-310.  At that appointment, Dr. Lanpher observed "slight erythema[12] on the palms and distal components of fingers with no visible edema, acneiform eruptions on the face along cheeks" which was greater on the left. Tr. 310.

On October 17, 2005, Shannon was seen by an opthamologist. Tr. 361.  At that appointment, Shannon complained of twitching of the left upper and lower eye lids, headaches, facial pain and twitching, and a red rash on the hands. Id.  The opthamologist diagnosed

---

12.  Erythema is defined as "a name applied to redness of the skin produced by congestion of the capillaries, which may result from a variety of causes[.]" Dorland's Illustrated Medical Dictionary, 577 (27th Ed. 1988).

Shannon as suffering from myokymia[13] and left facial pain. Id.

On November 3, 2005, Shannon had an appointment with Sandra Lin, M.D., at John Hopkins Medicine[14] at which Shannon complained of "feelings of eye twitching, headaches, and pain in the left face" and "redness in the hands." Tr. 569.  The diagnosis was atypical facial pain. Tr. 568.  At an appointment at John Hopkins Medicine on November 7, 2005, with Benjamin Ehst, M.D., Shannon complained of "persistent headaches mainly on the left side but becoming global," "persistent pain, tenderness, swelling and twitching of the muscle of the left eye," and facial, scalp and palm flushing. Tr. 366.

---

13. Myokymia is defined as "a benign condition marked by brief spontaneous tetanic contractions of motor units or groups of muscle fibers, usually adjacent groups of fibers contracting alternately." Dorland's Illustrated Medical Dictionary, 1091 (27th Ed. 1988).

14. John Hopkins Hospital and School of Medicine "uses one overarching name – John Hopkins Medicine – to identify its entire medical enterprise." About John Hopkins Medicine, http://www.hopkinsmedicine.org/about/ (Last accessed March 26, 2012).

The diagnosis was acne vulgaris and acne rosacea and persistent headaches and facial pain. Tr. 367.

On December 1, 2005, Shannon had an appointment with Edmund A. Pribitkin, M.D., at which she complained of "persistent pain and myokymia of the extraocular muscles[.]" Tr. 573.  Dr. Pribitkin's diagnosis was that Shannon suffered from "[c]hronic and atypical left facial pain" which he believed was "infraorbital neuralgia."[15] Id.

On December 27, 2005, Shannon had an appointment with Michael E. Crouch, M.D., in Salisbury, at which Shannon had multiple complaints, including facial pain, twitching eyelids, sharp pain in her hands, and changes in color of her skin. Tr. 315.

During the first quarter of 2006, Shannon had several appointments with Daniel E. Makas, D.O., at

---

15.  Neuralgia is defined as recurring "pain which extends along the course of one or more nerves. Many varieties of neuralgia are distinguished according to the part affected . . . ." Dorland's Illustrated Medical Dictionary, 1126 (27th Ed. 1988).

which she had multiple complaints, including pain and swelling of the hands and feet, facial flushing and fatigue.  Tr. 348, 351, 353 and 354.

On March 31, 2006, Shannon had an appointment with an endocrinologist in Annapolis, Maryland, who observed that Shannon had "alopecia, pustular acne, and coarse terminal hair along the chin, upper neck, and sides of face." Tr. 343.  Shannon complained of "periodic flushing," "bilateral painful hands with redness," and a history of "profuse sweating, headaches, and flushing." Tr. 343.

In February, Shannon had an appointment with Douglas B. Wilhite, a vascular surgeon, located in Salisbury, who after examining Shannon wrote a letter dated April 10, 2006, to Dr. Makas stating in part as follows: "I have informed Ms. Shannon that I do not believe there is a vascular cause, such as vasculitis or polyarteritis, that is causing her trouble.  The only possible diagnosis I arrived at during our discussion was reflex sympathetic dystrophy, and I referred her to

a neurologist or pain specialist to be evaluated for
this possible etiology." Tr. 334 and 339.

On May 10, 2006, Shannon had an appointment with
Aleksandr Shpigel, M.D., a specialist in internal
medicine, located in Philadelphia, at which Shannon
complained of burning pain in her hands and feet. Tr.
578-581.  Dr. Shpigel suspected RSDS and referred
Shannon to a specialist with respect to that condition,
Robert Schwartzman, M.D., Professor and Chairman of the
Department of Neurology at Drexel University College of
Medicine. Tr. 19 and 552-554.  Dr. Schwartzman was
unable to see Shannon and referred Shannon to a pain
specialist, Dr. Philip Getson, D.O. located in Marlton,
New Jersey. Id.  Dr. Schwartzman commenced treating
Shannon in March, 2008. Id.

On May 25, 2006, Shannon had an initial
consultation with Dr. Getson regarding her "left eye
pain, drooping of the left side of the mouth, twitching
of the left eye, facial pain, tenderness at the site of
the root canal previously done, tongue pain, burning in

the hard palate, 'grabbing' sensation in the left side
of the chest with chest and facial flushing . . .,
burning, resolving achiness, allodynia[16] in both hand and
all of the fingers, a 'blood rushing' sensation on the
top of the feet, burning in the dorsal feet, episodes of
redness and swelling with burning in the upper arms,
headaches, pain in the right side of her neck with a
'wooshing' sound in the right ear."  Tr. 476.

        During his physical examination of Shannon, Dr.
Getson found drooping of the left side of the mouth;
some slight drooping of the left eye lid; some twitching
of the left eye; some sensitivity of the left side of
the face; some tenderness of the cervical spine; minimal
paravertebral spasm on the left of the cervical spine;
paravertebral muscle spasm with tenderness over the left
trapezius, romboid and scalene muscles; some weakness
and defect in the fifth and seventh cranial nerves

_____

16. Allodynia is defined as "pain resulting from a non-
noxious stimulus to normal skin." Dorland's Illustrated
Medical Dictionary, 50 (27th Ed. 1988).

24

manifested by twitching of the eye, facial droop and lid lag; some sensitivity on the left side of the face in the upper and lower dental regions to firm pressure; grip strength was diminished on the left but fair in its extent; finger to thumb movements were sluggish on the left; altered sensation in the distal portions of the lower limbs; some weakness of the gastrocnemius muscles bilaterally; achilles reflexes were slightly diminished but adequate; a temperature reading of the left upper extremity was substantially cooler than the right upper extremity; and the left side of her face was substantially cooler than the right.  Tr. 479.

Dr. Getson's diagnosis was that Shannon suffered from RSDS/CRPS "primarily affecting the left upper extremity but has manifested itself in both lower extremities, predominantly in the distal portions therein."  Tr. 480.  Dr. Getson further found that it was "most affecting the facial region lending credibility to the theory that [the condition] emanated from the dental procedure" and "[t]he physical findings

on the face including the facial droop on the left, the
lid lag, the twitching of the face, the
hypersensitivity, and the affects on the facial and
trigeminal nerves all further suggest the initial site
of the nerve insult was secondary to the dental related
issues . . . ." Id.  Dr. Getson recommended that Shannon
commence taking the drug Topamax, a neuropathic agent,
to diminish her symptoms. Id.

On June 30, 2006, Shannon had a follow-up
appointment with Dr. Getson. Tr. 475. It was noted that
the Topamax was not helping and there was no appreciable
change in her physical examination. Id.  Dr. Getson
increased the dose of Topamax. Id.

On August 21, 2006, George Albright, M.D., on
behalf of the Bureau of Disability Determination signed
a document entitled "Case Analysis" which states in toto
as follows: "The claimant has multiple somatic
complaints and has been evaluated by a number of medical
specialists without evidence of a medically determinable
impairment." Tr. 420.

The notes of an appointment with Dr. Getson on September 1, 2006, indicate that Shannon had a fall on August 26, 2006, and was "getting worse" although the Topamax seemed to help but did cause her gums to bleed intermittently. Tr. 474.  It was further noted as follows: "She has burning and pain in the right hip and thigh. I have discussed this with her and told her that this is, in all probability, a reflection of an extension of the RSD secondary to the fall" that she sustained on August 25th. Id.  Dr. Getson recommended the drug Ketamine but there were "insurance-related constraints." Id.  Dr. Getson stated that "[h]opefully . . . she will be able to get the Ketamine" and did not schedule a follow-up appointment because of the distance between Shannon's home and his office in New Jersey. Id. Dr. Getson stated that he would see Shannon on an as needed basis.[17] Id.

_____

17.  The record reveals that Shannon "received authorization for the Ketamine" in May, 2007. Tr. 472. In notes of a May 29, 2007, appointment Dr. Getson stated as follows: "The patient advises that she has

(continued...)

On September 13, 2006, Shannon was examined on behalf of the Bureau of Disability Determination by Jethalal Harkani, M.D., a psychiatrist. Tr. 421-424. Dr. Harkani appears to accept the fact that Shannon was diagnosed with RSDS and primarily addresses Shannon's alleged depression and anxiety. Tr. 423.  With regard to those psychiatric conditions, Dr. Harkani states as follows: "This is a 32-year-old white female who seems to have some anxiety symptoms, pretty much chronic anxiety . . . .  After she was diagnosed with having the reflex sympathetic dystrophy, her anxiety symptoms have gotten worse.  Even though she has chronic anxiety she has not received any treatment until now.  She has mild symptoms of depression which seems to be more frustrated relative to her reflex sympathetic dystrophy symptoms and unable [sic] to work.  I do not see any evidence of

_____

17.  (...continued)
received authorization for the Ketamine, that they are 'billable codes' under her current insurance. We will move forward with this procedure when it becomes available." Id.

major depression or psychosis, mania or obsessive compulsive disorder." Tr. 423.

On September 27, 2006, Dale Peterson, Ph.D., a state agency psychologist completed a "Psychiatric Review Technique" form. Tr. 427-440.  Dr. Peterson concluded that Shannon suffered from a non-severe anxiety-related disorder. Tr. 427.

During the remainder of 2006, Shannon was treated by Usha Natesan, M.D., in Salisbury, Maryland. Tr. 441-445.  On October 18, 2006, Dr. Natesan diagnosed Shannon with RSDS, migraine headaches and limb pain. Tr. 441.  The notes of an appointment with Dr. Natesan on December 1, 2006, mention Shannon's history of RSDS. Tr. 443.  Shannon treated with Dr. Natesan throughout 2007. The notes of the appointments with Dr. Natesan all indicate Shannon's history of RSDS. Tr. 445, 525, 527-28, 530, 532, 534-35, 537 and 539.

On March 5, 2007, Shannon had an appointment with Robert A. Larson, M.D., a vascular surgeon.  Tr.

602-603.   After examining Shannon, Dr. Larson reported

as follows:

> Overall, Ms. Shannon has a quite unusual yet
> debilitating problem. Unfortunately I do not
> have any great incite to the case of her
> condition, . . . Her syndrome sounds more
> compatible with autonomic dysfunction,[18] and it
> is possible that this represents reflex
> sympathetic dystrophy. There does not appear any
> acute inciting event, however, the temporal
> relationship with the oral infection she had two
> and a half years ago is quite striking.  At this
> point, I can only recommend an evaluation by a
> neurologist with interest in peripheral and
> autonomic neuropathies. I see no role for
> surgical intervention in her problem.

Tr. 603.

On March 23, 2007, James Johnston, M.D., on

behalf of the Bureau of Disability Determination signed

---

18. Autonomic dysfunction is a broad term that
describes any disease or malfunction of the autonomic
nervous system.  See Vanderbilt Autonomic Dysfunction
Center, Vanderbilt University Medical Center,
http://www.mc.vanderbilt.edu/root/vumc.php?site=adc&doc
=4787 (Last accessed March 28, 2012). "The autonomic
nervous system (ANS) is the regulatory part of the
central nervous system (CNS). The ANS regulates the
automatic functions within the body that occur without
conscious effort. For example: heart rate, blood
pressure, body temperature, respiration, digestion,
etc." Neurological disorders, Autonomic Dysfunction
FAQ, MedHelp, http://www.medhelp.org/tags/health_page/
39830/neurological-disorders/Autonomic-Dysfunction-FAQ?
hp_id=181 (Last accessed March 28, 2012).

a document entitled "Case Analysis" which states in toto
as follows: "Medical condition not severe." Tr. 458.

On March 29, 2007, Lynda Payne, Ph.D., a state
agency psychologist, concurred with the prior opinion of
Dr. Peterson who found that Shannon had a non-severe
anxiety-related disorder. Tr. 459.

In September, 2007, Shannon was examined by
Eduardo De Sousa, M.D., an assistant professor of
neurology at Thomas Jefferson Medical College. Tr. 494-
495.  A physical examination of Shannon by Dr. De Sousa
revealed "a length-dependent pattern of reduced
sensation to pinprick and temperature in a long stocking
and glove distribution, with a first gradient from the
toes to the distal third of the feet, as well as a
second gradient across the knees; and from the
fingertips to the wrists, with a second gradient in the
middle of the forearms." Tr. 495.  Dr. De Sousa's
impression was that Shannon suffered from "[p]eripheral
neuropathy, with a predominant small fiber component. A
large fiber component is not excluded." Id.  Dr. De

Sousa ordered an electromyography and nerve conduction study to "further assess the peripheral neuropathy." Id. That study revealed "no definite electrophysiologic evidence of a generalized large fiber polyneuropathy" but did "not exclude the presence of small fiber polyneuropathy."[19] Tr. 482.

_____

19. "Neuropathy is a collection of disorders that occurs when nerves of the peripheral nervous system (the part of the nervous system outside of the brain and spinal cord) are damaged. The condition is generally referred to as peripheral neuropathy, and it is most commonly due to damage to nerve axons [nerve fibers]. Neuropathy usually causes pain and numbness in the hands and feet. It can result from traumatic injuries, infections, metabolic disorders, and exposure to toxins. . . . Neuropathy can affect nerves that control muscle movement (motor nerves) and those that detect sensations such as coldness or pain (sensory nerves). . . . Pain from peripheral neuropathy is often described as a tingling or burning sensation." Medical New Today, What is Neuropathy? Neuropathy Causes and Treatments, http://www.medicalnewstoday.com/articles /147963.php (Last accessed March 26, 2012). The Mayo Clinic website indicates that "[i]n many cases, peripheral neuropathy symptoms improve with time - especially if the condition is caused by an underlying condition that can be treated. A number of medications often are used to reduce the symptoms of peripheral neuropathy." Peripheral neuropathy, Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/ peripheral-neuropathy/DS00131(Last accessed February 7,

(continued...)

On March 31, 2008, Shannon was examined by Dr. Schwartzman in Philadelphia. Tr. 552-554.  Dr. Schwartzman's physical examination of Shannon revealed that the left side of Shannon's face was swollen and her left ear was red; Wright's, Allison's, and Roos'

---

19.  (...continued) 2012).

"Small fiber sensory neuropathy (SFSN) is a disorder in which only the small sensory cutaneous nerves are affected. The majority of patients experience sensory disturbances that start in the feet and progress upwards . . . .  The symptoms of small fiber sensory neuropathy are primarily sensory in nature and include unusual sensations such as pins-and-needles, pricks, tingling and numbness. Some patients may experience burning pain or coldness and electric shock-like brief painful sensations. Since SFSN usually does not involve large sensory fibers that convey balance information to the brain or the motor nerve fibers that control muscles, these patients do not have balance problems or muscle weakness. . . .  Treatment of SFSN depends on the underlying etiology . . . . Painful sensory paresthesias can be treated with anti-seizure medications such as gabapentin (Neurontin), pregabalin (Lyrica) and topiramate (Topamax), antidepressants such as amitriptyline (Elavil) and duloxetine (Cymbalta), or analgesics including opiate drugs."  Small Fiber Sensory Neuropathy, Neurology and Neurosurgery, Johns Hopkins Medicine,http://www.hopkinsmedicine.org /neurology_neurosurgery/conditions_main/old/small_fiber _sensory_neuropathy.html (Last accessed March 26, 2012).

abduction stress maneuvers[20] were positive on the left
side; Shannon had a positive Tinel's sign[21] throughout in
both upper left and right extremities; Shannon had pain
at the L4-L5 interspace and pain in the sciatic notch,
posterior popliteal fossae; Shannon's gastrocnemius
muscles were tender to compression; Shannon had swelling
on the left side of the face with sensitivity to
pinprick and cold; Shannon's gait was abnormal; Shannon
had decreased muscle strength in the upper and lower
extremities; Shannon had allodynia over the left upper

---

20.  The Wright's test is a provocation test which can
suggest the presence of thoracic outlet syndrome.  A
test is positive if there is a diminished wrist pulse.
Thoracic outlet Snydrome, Tests and diagnosis, Mayo
Clinic staff, http://www.mayoclinic.com/health/
thoracic-outlet-syndrome/DS00800/DSECTION=tests-and-dia
gnosis (Last accessed March 28, 2012). The Roos' test
is also a provocation test for thoracic outlet
syndrome. Id.  The reference to the "Allison's" test
may be a typographical error. There is an Adson's
maneuver which is also a test for thoracic outlet
syndrome. Id.

21.  A positive Tinel's sign suggests an irritated
nerve. It is a test for carpal tunnel syndrome. Carpal
Tunnel Syndrome, About.com Orthopedics, http://
orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel_2.
htm (Last accessed March 28, 2012).

quadrant; Shannon had decreased sensation in the left
upper quadrant and lower extremities; Shannon had joint
pain particularly on the left side in the small joints;
Shannon had poor rapid alternating movements and fine
movements which were worse in the left upper extremity;
and Shannon's reflexes were diminished in the upper
extremities, knees and left ankle. Id.  Dr.
Schwartzman's impression was that Shannon suffered from
RSDS/CRPS and he recommended treatment with Ketamine.
Id.

**DISCUSSION**

The administrative law judge, at step one of the
sequential evaluation process, found that Shannon did
not engage in substantial gainful work activity since
November 11, 2004, the alleged onset date. Tr. 9.

At step two of the sequential evaluation
process, the administrative law judge found that Shannon
had the following severe impairments: "Obesity, Anxiety,
Cervical Spondylosis, and Lumbar Degenerative Disc/Joint

35

Disease with sacroiliac arthrosis." Tr. 9.  The
administrative law judge, however, found that Shannon
did not suffer from RSDS, that is it was neither a
medically determinable impairment nor a severe
impairment. Tr. 13.

At step three of the sequential evaluation
process, the administrative law judge found that
Shannon's impairments did not individually or in
combination meet or equal a listed impairment. Tr. 23-
25.

At step four of the sequential evaluation
process, the administrative law judge found that Shannon
could not perform any of her past relevant work but that
Shannon had the residual functional capacity to perform
a limited range of unskilled, light work as defined in
the regulations.[22]  Tr. 25.  In so finding the

---

22. The terms sedentary, light, medium and heavy work
are defined in the regulations of the Social Security
Administration as follows:

(a) *Sedentary work*. Sedentary work involves
lifting no more than 10 pounds at a time and
(continued...)

---

22.   (...continued)
occasionally lifting or carrying articles like
docket files, ledgers, and small tools.
Although a sedentary job is defined as one
which involves sitting, a certain amount of
walking and standing is often necessary in
carrying out job duties.  Jobs are sedentary if
walking and standing are required occasionally
and other sedentary criteria are met.

(b) *Light work*.  Light work involves lifting no
more than 20 pounds at a time with frequent
lifting or carrying of objects weighing up to
10 pounds.  Even though the weight lifted may
be very little, a job is in this category when
it requires a good deal of walking or standing,
or when it involves sitting most of the time
with some pushing and pulling of arm or leg
controls.  To be considered capable of
performing a full or wide range of light work,
you must have the ability to do substantially
all of these activities. If someone can do
light work, we determine that he or she can
also do sedentary work, unless there are
additional limiting factors such as loss of
fine dexterity or inability to sit for long
periods of time.

(c) *Medium work*.  Medium work involves lifting
no more than 50 pounds at a time with frequent
lifting or carrying of objects weighing up to
25 pounds. If someone can do medium work, we
determine that he or she can do sedentary and
light work.

(d) *Heavy work*.  Heavy work involves lifting no
more than 100 pounds at a time with frequent

(continued...)

37

administrative law judge rejected the opinion of Philip

Getson, D.O., the treating physician, who concluded on

May 25, 2006, that Shannon suffered from RSDS and was

unable to perform the physical exertional requirements

of full-time sedentary work. Tr. 213-217 and 460-481.

The administrative law judge did not point to any

medical opinion regarding the physical functional

abilities of Shannon that was contrary to the opinion of

Dr. Getson and supportive of the finding that Shannon

could engage in unskilled, light work.

At step five, the administrative law judge,

based on a residual functional capacity of a limited

range of unskilled, light work as described above and

the testimony of a vocational expert, found that Shannon

had the ability to perform work as an officer helper and

an order clerk, and that there were a significant number

---

22.  (...continued)
        lifting or carrying of objects weighing up to
        50 pounds. If someone can do heavy work, we
        determine that he or she can also do medium,
        light, and sedentary work.

20 C.F.R. § 404.1567.

of such jobs in the local and national economies. Tr. 29.

The administrative record in this case is 628 pages in length and the court has thoroughly reviewed that record. Shannon argues, *inter alia*, that the administrative law judge erred when she rejected the opinions of treating physicians and concluded that Shannon's RSDS was not a medically determinable impairment. That argument has substantial merit.

The Social Security regulations direct the administrative law judge to consider whether there are any medically determinable impairments and then, when setting a claimant's residual functional capacity, to consider the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limit the

claimant's physical or mental abilities to perform basic
work activities, the claimant is "not disabled" and the
evaluation process ends at step two. Id.  If a claimant
has any severe impairments, the evaluation process
continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to
find a medical condition severe at step two will not
render a decision defective if some other medical
condition was found severe at step two.  However, all of
the medically determinable impairments, both severe and
non-severe, must be considered at step four when setting
the residual functional capacity.  The social security
regulations mandate such consideration and this court
has repeatedly so indicated. See, e.g., Christenson v.
Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May
18, 2011)(Muir, J.); Little v. Astrue, Civil No. 10-
1626, slip op. at 19-21 (M.D.Pa. September 14,
2011)(Kosik, J.); Crayton v. Astrue, Civil No. 10-1265,
slip op. at 32-35 (M.D.Pa. September 27, 2011)(Caputo,
J.); 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

Consequently, a conclusion at step two that a condition is not a medically determinable impairment is reversible error if not supported by substantial evidence.

There is a specific Social Security Ruling addressing how an administrative law judge is to determine whether RSDS is a medically determinable impairment.  That Ruling, SSR 03-02p, states in relevant part as follows:

> RSDS/CRPS are terms used to describe a constellation of symptoms and signs that may occur following an injury to bone or soft tissue. The precipitating injury may be so minor that the individual does not even recall sustaining the injury. Other potential precipitants suggested by the medical literature include, but are not limited to, surgical procedures, drug exposures, . . . and cervical spondylosis.
>
> *   *   *
>
> The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma.  Later, spontaneously occurring pain may be associated with the abnormalities in the affected region involving the skin, subcutaneous tissue, and bone.  It is characteristic of this syndrome

that the degree of pain reported is out of
proportion to the severity of the injury
sustained by the individual.  When left
untreated, the signs and symptoms of the
disorder may worsen over time.

*    *    *

RSDS/CRPS patients typically report persistent,
burning, aching or searing pain that is
initially localized to the site of injury. The
involved area usually has increased sensitivity
to touch. The degree of reported pain is often
out of proportion to the severity of the
precipitating injury.  Without appropriate
treatment, the pain and associated atrophic
skin and bone changes may spread to involve an
entire limb.  Cases have been reported to
progress and spread to other limbs, or to
remote parts of the body.

*    *    *

For purposes of Social Security disability
evaluation, RSDS/CRPS can be established in the
presence of persistent complaints of pain that
are typically out of proportion to the severity
of any documented precipitant and one or more of
the following clinically documented signs in the
affected region at any time following the
documented precipitant.

- Swelling;

- Autonomic instability – seen as changes in
  skin color or texture, changes in sweating
  (decreased or excessive sweating), changes in
  skin temperature, and abnormal pilomotor
  erection (gooseflesh);

42

- Osteoporosis; or

- Involuntary movements of the affected region of the initial injury.

When longitudinal treatment records document persistent limiting pain in an area where one or more of these abnormal signs has been documented at some point in time since the date of the precipitating injury, disability adjudicators can reliably determine that RSDS/ CRPS is present and constitutes a medically determinable impairment. It may be noted in the treatment records that these signs are not present continuously, or the signs may be present at one examination and not appear at another. Transient findings are characteristic of RSDS/CRPS, and do not affect a finding that a medically determinable impairment is present.

*    *    *

It should be noted that conflicting evidence in the medical record is not unusual in cases of RSDS due to the transitory nature of its objective findings and the complicated diagnostic process involved.

SSR 03-02p (emphasis added).  The court concludes that the administrative law judge did not comply with this ruling.

Although the administrative law judge extensively reviewed the medical records in her

43

decision, she focused on the transient nature of Shannon's symptoms in concluding that the longitudinal treatment records did not establish that she suffered from RSDS.  She also focused on the lack of an RSDS diagnosis by the majority of the physicians who examined Shannon and did not recognize the progressive nature of the illness.

The administrative law judge lists 24 physicians who treated Shannon between December 12, 2004 and December 31, 2006, Shannon's date last insured, and three physicians who treated Shannon after the date last insured and before the administrative hearing on November 25, 2008. Tr. 12-13.  The administrative law judge concluded that there were only two physicians that diagnosed Shannon with RSDS and that the other physicians discounted that diagnosis.  The administrative law judge further states that there were five separate opinions of state agency consultants indicating "that the medical and other objective evidence of record failed to establish the presence of

either any medically determinable impairment or any severe impairment." Tr. 10.  Our review of the administrative record reveals that this is not an accurate assessment of the medical evidence.[23]

The opinions of the state agency consultants – Dr. Albright, Dr. Harkani, Dr. Peterson, Dr. Johnston and Dr. Payne –  fail to address Shannon's RSDS or are conclusory without reference to any medical evidence or a reasoned analysis of the medical evidence.  Dr. Albright's statement that Shannon did not have <u>any</u> medically determinable impairments is conclusory and highly suspect in light of physicians who diagnosed Shannon as suffering from various conditions prior to that statement by Dr. Albright.[24]  Dr. Harkani did not

_____

23.  To put it mildly, the Commissioner in his brief engages in hyperbole when he states that "[e]very one of those doctors, except two, rejected Plaintiff's theory, found no connection between the root canal and her alleged symptoms, and concluded that Plaintiff did not have significant functional limitations." Doc. 8, Defendant's Brief, p. 1-2.

24.  The court suspects that Dr. Albright meant that Shannon had no severe impairments.

address whether Shannon's RSDS was either a medically determinable impairment or a severe impairment.   Dr. Peterson did not address whether Shannon's alleged RSDS was a medically determinable impairment.   There is no indication in the record what medical conditions Dr. Johnston considered.   Furthermore, he did not say there were no medically determinable impairments.   Finally, Dr. Payne merely concurred with the prior opinion of Dr. Peterson who found that Shannon had a non-severe anxiety-related disorder. Tr. 459.

Although two of the 24 physicians mentioned by the administrative law judge in her decision questioned the connection between Shannon's dental treatment and her condition, none of them stated that Shannon did not suffer from RSDS.  Dr. Moses merely stated that "[t]here may be a temporal but not an etiological relationship between the headaches, facial pain and the recent root canal" and Dr. MacLaughlin could not "definitely correlate all of [Shannon's] problems to her left-sided dental procedure." Tr. 285 and 307.

46

Also, as reviewed above, Shannon had an appointment with Dr. Larson, M.D., a vascular surgeon, at Thomas Jefferson University after the date last insured.  Dr. Larson stated that her symptoms were "compatible with autonomic dysfunction" and that they possibly represented RSDS.

The administrative law judge relying on the state agency medical consultants concluded "that the longitudinal treatment records of the claimant do not establish the presence of [RSDS] by a preponderance of the evidence."  Tr. 13.  The administrative law judge, in so finding, rejected the opinions of at least two treating physicians who found that Shannon suffered from RSDS and two other physicians who suspected or suggested that she suffered from that condition.

As for whether Shannon had RSDS, the administrative law judge committed reversible error when she relied on the conclusory opinions of the state agency consultants and rejected the opinions of two treating physicians.  Furthermore, the administrative

47

law judge did not comply with Social Security Ruling 03-2p which (1) specifically lists the diagnostic criteria as including swelling, autonomic instability (e.g., changes in skin color or temperature), abnormal hair or nail growth, osteoporosis and involuntary movements and (2) states that these diagnostic criteria can be transient.  In this case, the medical records reveal that prior to the date last insured, Shannon complained of widespread burning pain and on occasion had swelling, changes in skin color and temperature, and involuntary movements of the affected region.  Furthermore, one medical record suggests that she had abnormal hair growth in the affected region and Shannon further reported abnormal sweating.

The record also suggests that Shannon suffered from small fiber peripheral neuropathy.  The failure of the administrative law judge to find that condition as a medically determinable impairment, or to give an adequate explanation for discounting it, makes her

decisions at steps two and four of the sequential evaluation process defective.

The errors at step two of the sequential evaluation process also draws into question the administrative law judge's assessment of the credibility of Shannon.  The administrative law judge found that Shannon's medically determinable impairments could reasonably cause Shannon's alleged symptoms but that Shannon's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible.  This determination by the administrative law judge was based on an incomplete analysis of all of Shannon's medically determinable impairments.

The administrative law judge not only rejected the opinion of treating physicians regarding the conditions from which Shannon suffered, she also rejected the opinion of Dr. Getson regarding Shannon's functional abilities.  Dr. Getson completed a functional capacity assessment which limited Shannon to less than full-time sedentary work. Tr. 213-217.

49

The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id. In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id.  An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id.  An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions,

gleaned from the record and from his evaluation of the [claimant]'s credibility." <u>Id.</u>  As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." <u>Schmidt v. Sullivan</u>, 914 F.2d 117, 118 (7th Cir 1990).

In rejecting Dr. Getson's opinion, the administrative law judge did not point to any contrary medical opinion but engaged in her own lay analysis of the medical records.  The administrative law judge failed to give an adequate reason for rejecting the opinion of Dr. Getson.  In setting the residual functional capacity at a limited range of unskilled, light work, the administrative law judge did not point to any functional assessment performed by a treating physician or a physician who reviewed the medical records.  Instead, she engaged in her own lay analysis of the bare medical records.

The court recognizes that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. See Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121-122 (3d Cir. 2000). However, rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986)("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a). In this case, the bare medical record does not support the administrative law judge's residual functional capacity assessment.  There is a lack of substantial evidence supporting the administrative law

judge's residual functional capacity assessment and rejection of Dr. Getson's opinion.[25]

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. The court will, therefore, pursuant to 42 U.S.C. § 405(g), vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings. An appropriate order will be entered.

<u>s/Sylvia H. Rambo</u>
United States District Judge

---

25. In her decision, the administrative law judge made certain observations about Shannon's abilities which are not supported by the record. One such observation was that Shannon had the wherewithal to schedule and drive herself to the numerous medical appointments. Tr. 19. There is no evidence in the record establishing that Shannon drove herself to the medical appointments. Instead, the record suggests that she had family members drive her to the appointments. Tr. 39. A second assumption was that Shannon completed numerous handwritten forms. The record suggests that Shannon had assistance completing forms. Tr. 172 and 251. Furthermore, the ability to attend medical appointments and complete medical or disability forms does not translate into an ability to engage in unskilled, light work on a full-time basis (8 hours per day, 5 days per week).

Dated: April 11, 2012.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KRYSTAL SHANNON,                     :
                                     :
          Plaintiff                  :     CIVIL NO. 4:11-CV-00289
                                     :
     vs.                             :
                                     :
MICHAEL J. ASTRUE,                   :
COMMISSIONER OF SOCIAL               :     (Judge Rambo)
SECURITY,                            :
                                     :
          Defendant                  :

## ORDER AND JUDGMENT

In accordance with the accompanying memorandum,
IT IS HEREBY ORDERED THAT:

1.  The Clerk of Court shall enter judgment in
favor of Krystal Shannon and against the Commissioner of
Social Security as set forth in the following paragraph.

2.  The decision of the Commissioner of Social
Security denying Krystal Shannon disability insurance
benefits is vacated and the case remanded to the
Commissioner of Social Security to:

2.1 Conduct a new administrative hearing
and appropriately evaluate the medical evidence and the

credibility of Krystal Shannon in accordance with the background of this order.

      3.  The Clerk of Court shall close this case.

                             s/Sylvia H. Rambo
                          United States District Judge

Dated:  April 11, 2012.